### AFFIDAVIT OF DR. WILLIAM COOPER

OKLAHOMA COUNTY        )
                               )    ss.

STATE OF OKLAHOMA      )

I, William Cooper, being of lawful age, being duly sworn, depose and state as follows.

1.      I have personal knowledge of and am competent to testify as to the matters stated herein.

2.      I have been the Medical Director for Turn Key Health Clinics, LLC ("Turn Key") since 2016.

3.      In my role as Medical Director, I am familiar with the policies, practices and protocols of Turn Key.

4.      The policies attached to this affidavit as Exhibit A are the true and correct policies of Turn Key that were in effect during the month of June, 2018.

FURTHER AFFIANT SAYETH NOT.

_____
Dr. William Cooper

SUBSCRIBED and SWORN to before me this 29 day of March 2022.

_____
Notary Public

(SEAL) Notary Public

My commission expires on 10/16/2023

# TURN KEY HEALTH

Health Services
Policy & Procedures
**DAVID L. MOSS CORRECTIONAL CENTER**

| Date:12-1-16 |
|---|
| Reviewed: |
| Revised: 6-25-17 |

| **TITLE:  ACCESS TO CARE** | **NUMBER: TCSO-A-01** |
|---|---|
| | **Page 1 of 3** |

**Reference:**  **NCCHC:** J-A-01 (Essential)
**ACA:** 4-ALDF-4C-01 (Mandatory)

**Policy:**

1. Access to care to meet serious medical, dental, and mental health needs is the principle upon which all health services policies and health care standards are based.

2. The Responsible Health Authority (RHA) identifies and eliminates any barriers to inmates receiving health care.

**Definition:**

*Access to care* means that, in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgement, and receive care that is ordered.

**Procedure:**

1. Upon arrival at the facility, each inmate will be given an oral and  written orientation to the healthcare unit which will include:

   a.  Obtaining emergency services;

   b.  Ways to access sick call;

   c.  Utilization of pharmaceutical services;

   d.  Availability of chronic care clinics;

   e.  Use of inmate request forms.

   f.  The grievance process for health-related complaints.

2.  Non-English speaking inmates will be provided with a written translation of these instructions, and an interpreter if indicated.

3.  Inmates will be advised of the co-pay as part of the booking process.
    Charges shall not be compounded when the patient is seen by more than one provider for the same circumstance.

4.  The facility will deduct the amount indicated on the billing form from the inmate's account.

5.  After examination by the health care practitioner, the patient will be asked to sign a receipt for treatment. If the patient refuses to sign, the refusal will be witnessed by at least one correctional staff member.

6.  Only services initiated by the inmate should be subject to a fee or other charges. No charges should be made for the following:

    a.  Admission health screenings (medical, mental and dental) or any required follow-up to the screening.

    b.  Health assessments required by policy (H&P's; Periodic physical exams)

    c.  Emergency and Trauma Care

    d.  Infirmary Care

    e.  Prenatal and Perinatal care

    f.  In house lab and diagnostic services

    g.  Diagnosis and treatment of contagious diseases

    h.  Chronic care or other staff initiated care, including follow-up and referral visits.

    i.  Infestations, including lice and scabies

    j.  Treatment of injuries resulting from use of force, restraint checks, and injuries other than self-inflicted

    k.  Mental Health Care

    l.  Medical examination needed to become an Inmate Worker

    m.  Inmate Worker injured while working.

| TITLE:  ACCESS TO CARE | NUMBER: TCSO-A-01 |
|---|---|
| | Page 3 of 3 |

    n.  Patients treated as a result of sexual assault.

    o.  Psychotropic and chronic illness medications.

| Medical Director: | Date: |
|---|---|
| H.S.A.: | Date: |

# TURN KEY HEALTH

Health Services
Policy & Procedures
**DAVID L MOSS CRIMINAL JUSTICE CENTER**

| | |
|---|---|
| Date: 12-1-16 |
| Reviewed: |
| Revised: 6-25-17 |

| | |
|---|---|
| **TITLE:  RECEIVING SCREENING** | **NUMBER: TCSO-E-02**<br>**Page 1 of 5** |

**Reference:  NCCHC:** J-E-02 (Essential)
**ACA:** 4-ALDF-4C-22 (Mandatory)

**Policy:**

1. Receiving screening is performed on all inmates on arrival at the facility to ensure that emergent and urgent health needs are met.

2. Reception personnel ensure that persons who are unconscious, semi-conscious, bleeding, mentally unstable, severely intoxicated, in alcohol or drug withdrawal, or otherwise urgently in need of medical attention are:

   a. Referred immediately for care and medical clearance into the facility

   b. If they are referred to a community hospital and then returned, their admission to the facility is predicated on written medical clearance from the hospital.

3. Health needs are identified and addressed.

4. Potentially infectious inmates are isolated from the general inmate population.

5. If a woman reports current opiate use, she is immediately offered a test for pregnancy to avoid opiate withdrawal risks to fetus.

6. A receiving screening takes place for all inmates as soon as possible.

7. The receiving screening form is approved by the responsible health authority and inquires as to the inmate's:

   a. Current and past illnesses, health considerations, or special health requirements (e.g., dietary needs)

   b. Past serious infectious disease

    c.  Recent communicable illness symptoms (e.g., chronic cough, coughing up blood, lethargy, weakness, weight loss, loss of appetite, fever, night sweats)

    d.  Past or current mental illness, including hospitalizations

    e.  History of or current suicidal ideation

    f.  Dental problems

    g.  Allergies

    h.  Legal and illegal drug use (including type, amount, and time of last use)

    i.  Current or prior withdrawal symptoms

    j.  Possible, current, or recent pregnancy

    k.  Other health problems as designated by the responsible physician.

8.  The form also records reception personnel's observation of the inmate's:

    a.  Appearance (e.g., sweating, tremors, anxious, disheveled)

    b.  Behavior (e.g., disorderly, appropriate, insensible)

    c.  State of consciousness (e.g., alert, responsive, lethargic)

    d.  Ease of movement (e.g., body deformities, gait)

    e.  Breathing (e.g., persistent cough, hyperventilation)

    f.  Skin (including lesions, jaundice, rashes, infestations, bruises, scars, tattoos, and needle marks or other indications of drug abuse)

9.  The disposition of the inmate (e.g., immediate referral to an appropriate health care service, placement in the general population) is appropriate to the findings of the receiving screening and is indicated on the form.

10.  Receiving screening forms are dated and timed immediately upon completion and include the signature and title of the person completing the form.

11.  Prescribed medications are reviewed and appropriately maintained as clinically indicated.

12.   When health-trained correctional personnel perform the receiving screening they are trained by the responsible physician or designee in early recognition of medical or mental health conditions requiring clinical attention. Training is based on a curriculum approved by the responsible physician and contains instructions on completing the receiving screening form and when to contact health staff to determine appropriate disposition of the inmate.

13.   Health staff regularly monitors receiving screenings to determine the safety and effectiveness of this process.


**Definitions:**

*Medical Clearance*: A clinical assessment of physical and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to the hospital emergency room. The medical clearance is to be documented in writing.

*Receiving Screening:* A process of structured inquiry and observation intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment.

**Procedure:**

1.   Receiving Screening will be initiated by heath care staff using the "Receiving Medical Screening Form" which is timed and dated immediately upon completion, and signed by the screening staff.

2.   Inmates shall be refused admission to the jail if medically unstable; and sent to the hospital for evaluation and treatment.  Pre-booking medical screening criteria used to guide the determination of medical stability is approved by the Medical Director. The refusal and referral is documented on the "Fit Log".  When inmates are referred to an emergency department, their admission on return to the facility is predicated upon receipt of written documentation of treatment and necessary follow-up recommendations. Information will be entered in the "Fit Log" and the patient record.

3.   Health care staff, using the "Receiving Medical Screening Form", will conduct a basic receiving screening inquiry on:

   a.   Current and past illness and health problems or special health requirements (e.g. dietary needs);

   b.   Past serious infectious disease;

   c. Recent communicable illness symptoms (e.g., chronic cough, coughing up blood, lethargy, weakness, weight loss, loss of appetite, fever, night sweats);

   d. Past or current mental illness, including hospitalizations;

   e. History of or current suicidal ideation;

   f. Dental problems;

   g. Allergies;

   h. Legal and illegal drug use (including type, amount, and time of last use);

   i. Drug withdrawal symptoms;

   j. Current or recent pregnancy; and

   k. Other health problems as designated by the responsible physician.

4. Health care staff record, on the "Receiving Medical Screening" form, their screening observations of the inmate's:

   a. Appearance (e.g., sweating, tremors, anxious, disheveled)

   b. Behavior (e.g., disorderly, appropriate, insensible)

   c. State of consciousness (e.g., alert, responsible, lethargic)

   d. Ease of movement (e.g., body deformities, gait)

   e. Breathing (e.g., persistent cough, hyperventilation)

   f. Skin (including lesions, jaundice, rashes, infestations, bruises, scars, tattoos, and needle marks or other indications of drug abuse)

5. Immediate health needs are identified and addressed, and potentially infectious inmates are isolated.

6. If the patient's medical or behavioral health condition precludes placement in the jail or could adversely affect the inmate population, security staff designee will be notified.

7. Health care personnel will make disposition recommendations to security or classification staff based on assessment or review of screenings:

| TITLE:  RECEIVING SCREENING | NUMBER: TCSO-E-02 |
|---|---|
| | Page 5 of 5 |

    a.  Emergency Department – patients with unstable or emergent needs

    b.  General population – no anticipated problems

    c.  Close observation – patients who are at risk for self-harm or medical problems such as alcohol intoxication or possible drug withdrawal

    d.  Medical housing or special accommodations - inmates with medical problems such as seizures, insulin dependent diabetes, cardiac or respiratory conditions, or physical limitations

    e.  Isolation – for patients with potentially infectious diseases

8. The disposition of the patient (e.g. immediate referral to appropriate health care service, placed in general population) is indicated on the "Receiving Medical Screening" form.

9. Patients entering the facility on prescription medications continue to receive the medication in a timely fashion as prescribed following verification, or acceptable alternate medications are provided as clinically indicated.

10. The "Receiving Medical Screening" form will be integrated with prior Health Records or incorporated into a new health record if the patient has subsequent contact with medical.

11. If the patient refuses to be screened or is "unscreenable" due to mental health or other conditions, he/she will be held in intake housing or medical observation until the screening can be completed.

12. If patient is a Juvenile appropriate parent or guardian consent for care shall be obtained.

| MEDICAL DIRECTOR: | DATE: |
|---|---|
| HSA: | DATE: |

# TURN KEY HEALTH

Health Services
Policy & Procedures
**DAVID L MOSS CRIMINAL JUSTICE CENTER**

| | |
|---|---|
| Date: 12-1-16 | |
| Reviewed: | |
| Revised: 6-25-17 | |

**TITLE:  INITIAL HEALTH ASSESSMENT**   **NUMBER: TCSO-E-04**
**Page 1 of 3**

**Reference: NCCHC:** J-E-04 (Essential)
**ACA:** 4-ALDF-4C-24,25

**Policy:**

1.  All patients receive a comprehensive physical and heath appraisal no later than 14 calendar days after admission to the facility.

2.  Health appraisals are not required for inmates readmitted to the correctional institution when the last health assessment was performed within 90 days, and when the inmate's new receiving screening shows no change in health status.

3.  The health appraisal includes, at a minimum:

    a.  Review of receiving screening results;

    b.  A qualified health professional collects additional data to complete the medical, dental, and mental health histories.

    c.  A qualified health care professional records vital signs including weight and height.

    d.  A physical examination (as indicated by the patient's gender, age, and risk factors) performed by a physician, physician assistant, nurse practitioner, or a Registered Nurse who has completed appropriate training approved by the responsible physician).

    e.  Laboratory and/ or diagnostic test results to detect communicable diseases, including sexually transmitted infections and tuberculosis, as indicated.

    f.  Consideration for immunizations when appropriate.

    g.  All positive findings (i.e., history and physical, screening, and laboratory,) are reviewed by the provider. Specific problems are integrated into an initial problem list. Diagnostic and therapeutic plans for each problem are developed as clinically indicated.

**TITLE:  INITIAL HEALTH ASSESSMENT**

**Definitions:**

*Health Assessment*: The process whereby an individual's health status is evaluated including questioning the patient about symptoms. The extent of the health assessment is defined by the responsible physician but should include at least the steps listed in the policy.

*Physical Examination*: An objective, hands-on evaluation of an individual. It involves the inspection, palpation, auscultation, and percussion of a patient's body to determine the presence or absence of physical signs of illness.

*Treating Clinician:* For the health assessment, treating clinician is defined as a nurse practitioner, physician assistant, or physician.

*Clinically Significant Findings:* Any deviation from the normal that significantly impacts the health, safety, and welfare of the patient.

**Procedure**:

1. The health appraisal will be documented by an approved health professional and filed in the patient's medical record.

2. A TB skin test will be administered, unless contraindicated, and entered into a tracking log.

3. GC, Chlamydia, and HIV testing will be offered to those patients, with appropriate consent and counseling, who have related symptoms, high-risk behaviors, or who request that they be tested.

4. When appropriate, additional investigations will be carried out regarding the following:

   a. The use of alcohol and / or drugs, including types of substances abused, mode of use, amounts used, frequency of use, and date or time of last use;

   b. Current or previous treatment for alcohol or drug abuse, and if so, when and where;

   c. Whether the patient is taking medication for an alcohol or drug abuse problem;

   d. Whether the patient is taking medication for a psychiatric disorder, and if so, what drugs, and for what disorder; and

   e. Current or past illnesses and health problems related to substance abuse.

5. Referrals to medical, dental and behavioral health will be initiated, based on the findings of the health assessment.

| TITLE:  INITIAL HEALTH ASSESSMENT | NUMBER: TCSO-E-04 |
|---|---|
| | Page 3 of 3 |

| Medical Director: | Date: |
|---|---|
| H.S.A: | Date: |

# TURN KEY HEALTH

Health Services
Policy & Procedures
**DAVID L MOSS CRIMINAL JUSTICE CENTER**

| |
|---|
| Date: 12-1-16 |
| Reviewed: |
| Revised: 6-25-17 |

| | |
|---|---|
| **TITLE:   MENTAL HEALTH SCREENING AND** | **NUMBER: TCSO-E-05** |
| **EVALUATION** | **Page 1 of 4** |

**Reference:   NCCHC:** J-E-05
**ACA:** 4-ALDF-4C-29 (Mandatory)

**Policy:**

1.   All inmates receive mental health screening; inmates with positive screens receive a mental health evaluation.

2.   Within 14 days of admission, qualified mental health professionals or mental health staff conduct an initial mental health screening.

3.   The initial mental health screening includes a structured interview with inquiries into:

   a.   A history of:

      i.   Psychiatric hospitalization and outpatient treatment

      ii.   Substance abuse hospitalization

      iii.   Detoxification and outpatient treatment

      iv.   Suicidal behavior

      v.   Violent behavior

      vi.   Victimization

      vii.   Special education placement

      viii.   Cerebral trauma or seizures

      ix.   Sex offenses

      x.   The current status of:

      xi.   Psychotropic medications

        xii. Suicidal ideation

        xiii.Drug or alcohol use

        xiv. Orientation to person, place, and time

        xv. Emotional response to incarceration

1.  A screening for intellectual functioning (i.e., mental retardation, developmental disability, learning disability)

2.  The patient's health record contains results of the initial screening.

3.  Inmates who screen positive for mental health problems are referred to qualified mental health professionals for further evaluation.

4.  The health record contains results of the evaluation with documentation of referral or initiation of treatment when indicated.

5.  Patients who require acute mental health services beyond those available on-site are transferred to an appropriate facility.


**Definitions:**

*Mental Health Staff:*  Qualified health care professionals who have received instruction and supervision in identifying and interacting with individuals in need of mental health services.

*Violent Behavior:* Expressive violence initiated as a result of an interpersonal altercation where the goal is to injure the other person, or as instrumental violence where the goal is to get something from the person (usually the result of criminal intent). An understanding of the history of either form of violence and the circumstances leading to the specific behavior is helpful in assessing the patient's potential for further violent behavior.

*Screening for Intellectual Functioning:* Screening which includes inquiry into the history of developmental and educational difficulties and, when indicated, referral for application of standardized psychological intelligence tools as appropriate.

*Qualified Mental Health Professionals:* Include psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

**Procedures:**

1.  The initial mental health screening includes a structured interview with inquiries into:

    a.  Past or current mental illness, including hospitalizations

    b.  Present suicidal ideation or history of suicidal behavior

Case 4:20-cv-00303-GKF-SH   Document 90-5 Filed in USDC ND/OK on 04/01/22   Page 15 of 33

    c.  Is presently being treated for mental health problems or is prescribed psychotropic medications

    d.  Current mental health complaint

    e.  History of inpatient and outpatient psychiatric treatment

    f.  History of treatment for substance abuse

2.    Screening includes observation of:

    a.  General appearance and behavior; (including presence of delusions, hallucinations, communication difficulties, speech and posture, impaired level of consciousness, disorganization, memory defects, depression, or evidence of self-mutilation).

    b.  Potential for symptoms of withdrawal from alcohol and other drugs.

3.    Mental health screening includes:

    a.  Psychiatric history and outpatient / inpatient treatment

    b.  Current psychotropic medications

    c.  History and present status of suicidal ideation or behavior

    d.  Drug usage

    e.  Alcohol usage

    f.  History of sex offenses

    g.  History of expressive or instrumental violent behavior

    h.  History of sexual victimization

    i.  Special education placement

    j.  History of cerebral trauma or seizures

    k.  Emotional response to incarceration

    l.  Screening for cognitive functioning

    m.  Orientation to person, place, and time.

| TITLE:  MENTAL HEALTH SCREENING AND EVALUATION | NUMBER: TCSO-E-05 Page 4 of 4 |
|---|---|

1.   Patients whose screen indicates mental health problems are referred to qualified mental health professionals for further evaluations.

2.   Once screening is completed, inmates will be cleared for general population, cleared for general population with appropriate referral to mental health care as needed, placed on the mental health unit to receive appropriate mental health care, which may include emergency treatment, or referred to an appropriate mental health facility.

3.   The mental health screening and evaluation will be filed in the Health Record. Documentation of on-going monitoring and treatment will be maintained in the Health Record.

| Medical Director: | Date: |
|---|---|
| H.S.A: | Date: |



Health Services
Policy & Procedures
**DAVID L MOSS CRIMINAL JUSTICE CENTER**

| Date: 12-1-16 |
| Reviewed: |
| Revised: 6-25-17 |

| **TITLE:  SEGREGATED INMATES** | **NUMBER: TCSO-E-09** |
| | **Page 1 of 3** |

**Reference:  NCCHC:** J-E-09
                 **ACA:** 4-ALDF-2A-45-53 (Mandatory)

**Policy:**

1.  When an inmate is segregated, health staff monitor his or her health.

2.  Upon notification that an inmate is placed in segregation, a qualified health care professional reviews the inmate's health record to determine whether existing medical, dental, or mental health needs contraindicate the placement or require accommodation. Such review is documented in the health record.

3.  Monitoring of segregated inmates is based on the degree of isolation:

    a.  Inmates under extreme isolation with little or no contact with others are monitored daily by medical staff and at least weekly by mental health.

    b.  Inmates who are segregated and have limited contact with staff or others are monitored 3 days a week by medical or mental health staff.

    c.  Inmates who are allowed periods of recreation or other routine social contact while being segregated from the general population are checked weekly by medical or mental health staff.

4.  Documentation of segregation rounds is made in an inmate's health record, and includes the date and time of the contact and the signature or initials of the health staff member making rounds.

5.  Any significant health findings are documented in the inmate's health record.

6.  Health staff promptly identify and inform custody officials of inmates who are physically or psychologically deteriorating, and those exhibiting other signs or symptoms of failing health.

7.    Health staff inform custody officials of the latest scientific information concerning any health effects of segregation

**Definitions:**

1.    *Segregated Inmates*: those inmates isolated from the general population and who receive services and activities apart from other inmates.

2.    Facilities may refer to such conditions as administrative segregation, protective custody, disciplinary segregation, or a supermax tier. Some facilities, such as supermax lockdown, have all inmates in a segregated status. For the purposes of this standard, the living and confinement conditions defined the segregated status, not the reason an inmate was placed in segregation

3.    *Extreme Isolation:* Refers to situations in which inmates are seen by staff or other inmates fewer than 3 times per day.

**Procedure:**

1.    When notified of inmate's transfer to segregation, health care staff will review the medical record to determine any medical or mental health contraindications and potential accommodations that may be needed. The review will be documented in the health record and significant findings will be communicated to security.

2.    Health care staff will make rounds on inmates who are segregated as indicated by level of isolation and the developed care plan and at a minimum weekly.

3.    During rounds:

     a.    Inmates will be given the opportunity to request care; and

     b.    Health care staff will monitor each inmate's general medical and mental health status.

4.    Health care rounds will be documented on each inmate's segregation log. Any significant health findings are documented in the health record.

5.    Health care staff will ensure that the segregation area has sick call request forms, which will be collected by health care staff during rounds.

6.    Necessary clinical encounters do not take place cell side, but occur in an appropriate clinical setting and will be documented appropriately in the patient's Health Record.

| TITLE:  SEGREGATED INMATES | NUMBER: TCSO-E-09 |
|---|---|
| | Page 3 of 3 |

7.     Inmates needing medical intervention unable to be completed within the segregation area will be scheduled for clinic visit.

8.     Behavioral health staff will be notified when an inmate receiving mental health treatment, or who has potential mental health risk, has been placed in segregation to ensure appropriate mental health follow-up.

9.     Inmates who exhibit violent, mental disorders, or unusual bizarre behavior will be referred to health services for medical assessment and appropriate follow-up management.

| **Medical Director:** | **Date:** |
|---|---|
| **H.S.A.** | **Date:** |

# TURN KEY HEALTH

Health Services
Policy & Procedures
**DAVID L. MOSS CRIMINAL JUSTICE CENTER**

| | |
|---|---|
| Date: 12-1-16 | |
| Reviewed: | |
| Revised: | |

**TITLE: PATIENTS WITH SPECIAL HEALTH NEEDS**

**NUMBER: TCSO-G-02**
**Page 1 of 3**

**Reference:** NCCHC: J-G-02 (Essential)
ACA: 4-ALDF-4C-07, 24 (Mandatory)

**Policy:**

1.  A proactive program exists that provides care for special needs patients who require close medical supervision or multidisciplinary care.

2.  Individual treatment plans are developed by a provider or other qualified clinician at the time the condition is identified, and updated when warranted.

3.  The treatment plan includes at a minimum:

    a.  the frequency of follow-up for medical evaluation and adjustment of treatment modality

    b.  the type and frequency of diagnostic testing and therapeutic regimens

    c.  when appropriate, instructions about diet, exercise, adaptation to the correctional environment, and medication.

4.  Special needs are listed on the master problem list.

5.  The facility maintains a list of special needs patients.

**Definitions:**

*Special Needs Patients* are those with health conditions that require regular care.

*A treatment plan* is a series of written statement specifying a person's particular course of therapy and the roles of qualified health care professionals and carrying it out.

**Procedure:**

1. Inmates with significant health conditions receive ongoing multidisciplinary care.

2. The special needs program serves a broad range of health conditions and problems that require the provider or other designated qualified health care professional to design a treatment plan tailored to the patient's needs.

3. The treatment plan is individualized, typically multidisciplinary, and based on an assessment of the patient's needs, and includes a statement of short and long-term goals as well as the methods by which those goals will be pursued. When clinically indicated, the treatment plan gives patients access to the supportive and rehabilitative services (e.g., physical therapy, individual or group counseling, self-help groups) that the treating clinician deems appropriate.

4. The treatment plan may use any format that contains all of the required elements. Individual treatment planning forms are preferable since they facilitate developing a comprehensive plan that is easily identifiable. SOAPE (subjective, our objective, assessment, plan, education) notation in the progress notes is another way to document a treatment plan.

5. Special needs patients include, but are not limited to, the following groups:

   a. Adolescents

   b. Developmentally disabled individuals, (e.g., fetal alcohol spectrum disorder, autism, brain injury, and down syndrome patients)

   c. Frail or elderly inmates

   d. Patients with physical disabilities or other disabilities that limit daily functioning (e.g., visual, hearing, or speech impairments)

   e. Patients with serious mental health needs including those with basic psychotic disorders or mood disorders (e.g., depressive disorder or bipolar disorder), those who self-injure, the aggressive mentally ill, those with post-traumatic stress disorders, and suicidal inmates

   f. Patients with alcohol or other substance abuse

   g. Patients with Gender Dysphoria

   h. Patients with recent hospitalizations, emergency room visits, and/or urgent care visits may qualify.

TITLE:  PATIENTS WITH SPECIAL HEALTH NEEDS

6.  The Problem List includes known drug allergies and any special needs. Problem lists are initiated at intake and updated as necessary.

7.  Regularly scheduled chronic care clinics can be utilized to ensure continuity of care for special needs patients. Chronic clinics are documented on the Chronic Care Clinic form.

8.  Many patients with mental illness also have co-occurring substance abuse disorders. In addition, post-traumatic stress disorders are common among inmates due to past sexual, physical, or emotional abuse. Alcohol and other substance abuse can be significant problems requiring individual treatment planning.

9.  It is recommended that treatment plans for patients with mental health conditions incorporate ways to address the patient's problems and enhance patients' strengths, involve patients in their development, and include relapse prevention and risk management strategies. These strategies should describe signs and symptoms associated with relapse or recurring difficulties (e.g., auditory hallucinations), how the patient thinks a relapse can be averted, and how best to help the patient manage crises.

| Medical Director: | Date: | 12-1-16 |
|---|---|---|
| H.S.A: | Date: | 12-1-16 |



Health Services
Policy & Procedures
**DAVID L MOSS CRIMINAL JUSTICE CENTER**

| Date: 12-1-16 |
| Reviewed: |
| Revised: |

| **TITLE:  MENTAL HEALTH SERVICES** | **NUMBER: TCSO-G-04** Page 1 of 4 |

**Reference:  NCCHC:** J-G-04; J-E-07 (Essential)
**ACA:** 4-ALDF-4C-27, 28, 29, 30, 31 (Mandatory)

**Policy:**

1. Mental health services are available for all inmates who require them.

2. Patients' mental health needs are addressed on site or by referral to appropriate alternative facilities. They are addressed by a range of mental health services of differing levels and focus, including residential components when indicated.

3. Regardless of the facility's type or size, basic on-site outpatient services include at a minimum:

   a. Identification and referral of patients with mental health needs

   b. Crisis intervention services

   c. Psychotropic medication management, when indicated

   d. Individual counseling, group counseling, psychosocial/psychoeducational programs

   e. And treatment documentation and follow-up

4. When commitment or transfer to an inpatient psychiatric setting is clinically indicated, required procedures are followed and the transfer occurs in a timely manner. Until such transfer can be accomplished, the patient is safely housed and adequately monitored.

5. Outpatients receiving basic mental health services are seen as clinically indicated, but not less than every 90 days. Those with a chronic mental illness are seen as prescribed in their individual treatment plans.

6.     Mental health, medical and substance abuse services are sufficiently coordinated such that patient management is appropriately integrated, medical and mental health needs are met, and the impact of any of these conditions on each other is adequately addressed.

**Definition:**

*Mental health services:* patient services which include the use of a variety of psychosocial and pharmacological therapies, either individual or group, including biological, psychological, and social, to alleviate symptoms, attain appropriate functioning, and *prevent relapse*.

**Procedure:**

1.     Patients are screened for mental health problems on intake, during the receiving screening process.

2.     If the patient arrives with a prescription for psychotropic medication and/or informs the intake nurse that he/she is taking medication the medications, once verified, an order for the medications is obtained from the Health Care Provider (HCP), or Psychiatrist. The patient is then referred to the Mental Health Department for Evaluation.

3.     A psychiatric evaluation of patients on the Mental Health unit will be conducted by the Psychiatrist, HCP, or licensed mental health practitioner within forty-eight hours (72 hours on weekends) of intake or referral to the Mental Health department.

4.     If the patient is admitted with medication orders that have expired, nursing staff will obtain an order from the clinician on-call (or on-site) for a reorder of prescriptions for a period not to exceed seven (7) days, with referral to the mental health department, as appropriate.

5.     A mental health evaluation will be conducted for all patients within 14 days of arrival and documented by mental health personnel.

6.     Patients may request mental health services by completing request. All patient self-referrals will be followed up in a timely manner. The Mental Health Director or designee will review self referrals on a daily basis and assign priority of follow-up based on content of self-referral.

7.     Health care staff may refer patients for mental health services when indicated.

8.     Institutional staff may refer any patient that they believe to be in need of mental health assistance. Referral may be verbal or written.

| TITLE:  MENTAL HEALTH SERVICES | NUMBER: TCSO-G-04 |
|---|---|
| | Page 3 of 4 |

9.     Verbal or written requests are received daily and triaged by nursing or mental health staff within twenty-four (24) hours and referred to mental health staff as needed.

10.    Patients referred for mental health treatment shall receive an evaluation by a mental health professional within 14 days of the referral request. Evaluation will be documented in the health record.

11.    In emergency situations when mental health staff are not on site, health care staff will contact the on-call mental health professional to facilitate immediate mental health assistance.

12.    Mental Health treatment is available on-site in the form of individual appointments with the mental health staff and psychotropic medication management. On-site mental health care includes crisis intervention, short-term individual therapy, psychotropic medications and single cell housing either with or without restrictions based on the patient's potential for self-harm, or placement on the mental health unit.

13.    When a patient is placed on the mental health unit, they will be designated as follows:

   a.     Level 1-Suicide Prevention I (SPI)- for patients that are potentially an imminent danger to self or others and requires constant monitoring.

   b.     Level 2-Suicide Prevention II (SPII)-for patients with severe mental illness including mood and psychotic disorders, but not including personality disorders or behavioral problems. These patients may be at high risk of becoming a danger to self or others.

   c.     Level 3- Mental Health Observation (MHO)-for patients with severe mental illness that are not currently considered to be a danger to self or others, or has been on Level 2 and has been compliant with treatment for at least one week.

   d.     Level 4-M.H. Housing- for patients with severe mental illness currently considered stable and compliant with treatment.

14.    Informed consent shall be obtained by a QMHP or HCP for all patients prescribed psychotropic medications, except when emergency medications or court ordered medications are administered.

15.    If the patient is admitted from the state hospital, on psychotropic medications, nursing staff will obtain an order from the HCP on-call or on-site for reorder of the

| TITLE: MENTAL HEALTH SERVICES | NUMBER: TCSO-G-04 |
|---|---|
| | Page 4 of 4 |

prescription for a period not to exceed 30 days, with referral to the mental health department.

| Medical Director: | Date: | /2-1-16 |
|---|---|---|
| H.S.A: | Date: | 12-1-16 |

# TURN KEY HEALTH

Health Services
Policy & Procedures
**DAVID L MOSS CRIMINAL JUSTICE CENTER**

| Date: 12-1-16 |
| Revised: 6-25-17 |
| Revised: 9-12-17 |

**TITLE:  SUICIDE PREVENTION PROGRAM**

**NUMBER: TCSO-G-05**
**Page 1 of 8**

**Reference:**  **NCCHC:** J-G-05 (Essential)
**ACA:** 4-ALDF-4C-32-33 (Mandatory)

**Policy:**

1. The facility identifies suicidal inmates and intervenes appropriately.

2. The suicide prevention program includes the following:

   a. Facility staff identify suicidal inmates and immediately initiate precautions.

   b. Suicidal inmates are evaluated promptly by the designated mental health professional, who directs the intervention and assures follow-up as needed.

   c. Acutely suicidal inmates are placed on continuous observation.

   d. Non-acutely suicidal inmates are monitored on an unpredictable schedule with no more than 15 minutes between checks. If, however, the non-acutely suicidal inmate is placed in an isolation cell, close observation is required.

3. Key components of a suicide prevention program include the following:

   a. Training

   b. Identification

   c. Referral

   d. Evaluation

   e. Treatment

   f. Housing and monitoring

   g. Communication

   h. Intervention

   i. Notification

    j.   Review

    k.   Debriefing

4.    The use of other inmates in any way (e.g., companions, suicide-prevention aides) is not a substitute for staff supervision.

5.    Treatment plans addressing suicidal ideation and its reoccurrence are developed, and patient follow-up occurs as clinically indicated.

6.    The responsible health authority approves the facility's suicide prevention plan; training curriculum for staff, including development of intake screening for suicide potential and referral protocols; and training for staff conducting the suicide screening at intake.

**Definitions:**

1.    *Acutely suicidal* (active) inmates are those who engage in self-injurious behavior or threatened suicide with a specific plan. These inmates should be placed on constant observation.

2.    *Non-acutely suicidal* (potential or inactive) inmates are those who express current suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or have a recent prior history of self-destructive behavior. In addition, inmates who deny suicidal ideation or do not threaten suicide but demonstrate other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes).

**Procedure:**

1.    Training:

    a.    All health care personnel and correctional staff will be trained in all aspects of suicide prevention including the knowledge that a patient is particularly susceptible to becoming suicidal at the following times:

        i.    Upon admission to the facility

        ii.    After adjudication

        iii.    Upon return from court

        iv.    Following bad news about a family member or significant other

        v.    After suffering from some type of humiliation or rejection; or

        vi.    When previous depression appears to be resolving.

    b.    The following signs and symptoms of suicidal ideation will be reviewed at all suicide prevention training:

           i.     Despair/hopelessness

           ii.    Poor self-image / feelings of inadequacy

           iii.   Great concern regarding "What will happen to me?"

           iv.   Past history of suicidal attempt

           v.    Verbalization of a suicidal plan

           vi.   Loss of interest in personal hygiene and daily activities

           vii.  Depressed state indicated by verbalizations, crying, withdrawal, insomnia, lethargy, indifference to surroundings and other people

           viii. Sudden drastic change in eating or sleeping habits

           ix.   Hallucinations, delusions, or other manifestations of loss of touch with reality

           x.    Sudden marked improvement in mood following period of obvious depression.

    c.    Other topics covered in this training will include but not be limited to:

           i.     Identifying other warning signs and symptoms of impending suicide

           ii.    Understanding the demographic and cultural parameters of suicidal behavior, including incidence and variations in precipitating factors

           iii.   Responding to suicidal and depressed patients

           iv.   Communication between correctional and health care personnel

           v.    Using referral procedures

           vi.   Housing observation and suicide-watch level procedures

           vii.  Follow-up monitoring of patients who make a suicide attempt

2.    Identification:

    a.    The Receiving / Screening staff will assess each patient's suicide potential at intake.

    b.    If the patient is assessed as being at risk for suicide, the receiving staff member will notify the appropriate mental staff member via telephone and obtain orders, if necessary, for special housing in the Mental Health Unit (MHU) and any restrictions needed to ensure the patient's safety.

    c.    The nurse will follow up to ensure that appropriate housing and precautions are initiated, and will notify Mental Health staff.

d. Within fourteen (14) days of admission to the facility, all patients, as part of their medical health assessment will be re-assessed for suicide risk. This will be documented on the "Health Assessment" form.

3. Referrals:

a. Referrals to mental health professionals may be made throughout the incarceration by healthcare staff, patients, and correctional staff.

b. All patients identified as suicidal will be immediately referred for evaluation by a Mental Health professional and transferred to the MH unit.

4. Assessment:

a. Any staff member of the facility who recognizes that a patient is potentially suicidal, will notify Mental Health staff immediately and take immediate precautions to protect the patient from self-harm.

b. Patients identified as potentially suicidal will be evaluated as soon as possible by a qualified Mental Health Professional (QMHP).  Pending evaluation, the patient will be kept under close observation by correctional or medical staff.

c. Upon assessment by the mental health professional the level of suicide precautions will be ordered as needed. The patient will be re-assessed regularly to identify any change in condition indicating a need for change in supervision level or required transfer. Changes in level of supervision require a documented face-to-face assessment by QMHP.

d. If at any time the facility is not equipped with housing or staff to maintain the patient's safety while he/she is suicidal, transfer shall be arranged to the closest facility that can offer adequate protection of the patient.

e. All patients placed in suicide precaution will be assessed by a licensed mental health professional (LMHP) within 48 hours of being placed in that precaution.  If this assessment is conducted by a LMHP *other than* a psychiatrist the LMHP will make an urgent referral to psychiatry when appropriate.

f. Once the patient is discharged from suicide precautions, a follow-up appointment will be made with mental health staff.

g. If a patient is scheduled for release prior to being removed from suicide watch, the charge nurse will notify the on-call qualified mental health provider of the pending release.  The on-call mental health practitioner will ensure that a final screening / evaluation is conducted.  If at the time of this screening the patient continues to present a danger to self or others, commitment procedures will immediately be initiated by the qualified mental health practitioner.

h. It is advised that a patient on observation status not be released from custody in the middle of the night or without adequate discharge planning.

Case 4:20-cv-00303-GKF-SH Document 90-5 Filed in USDC ND/OK on 04/22/22 Page 31 of 33

5.    Housing:

    a.    Health staff will follow the facility's plan for suicidal patient housing.

    b.    Once a patient has been identified as "at risk" for suicide, he/she shall not be housed alone unless continuous observation is maintained.

    c.    Patients shall be placed in housing that is rendered suicide-resistant; e.g. free of sharp objects, protrusions such as hooks or clothing items that can be used in hanging. Video surveillance can be used but should not replace direct visualization of patients at-risk.

    d    Patients placed under Continuous Observation or Close Observation will continue to receive all privileges unless security and safety requirements dictate otherwise (as determined by the medical provider or the facility commander) or unless a violation of the facility rules and regulations takes place. Patients at risk for suicide may not be given bedding, utensils, or other items that could be used in self-harm per physician's order. It is recommended that the facility consider suicide smocks/blankets for these patients.

6.    Monitoring:

    a.    Suicide prevention monitoring status are as follows:

        i.    <u>Continuous Observation (SPI)</u> – patient is constantly observed by any trained staff member, correctional, medical or other. This watch is generally used for patients who present as acutely suicidal and who are at imminent risk of engaging in self-injurious behavior. A continuous watch should also be considered when there is a question of imminent risk and the clinical picture is unclear. Recent, serious suicide attempts (e.g. attempted hangings, wrist slashing, etc.) may also warrant this watch. Also, any patient on suicide watch that is housed in a single cell environment will be maintained on Continuous Observation. This observation will be documented on the appropriate form by either security or medical staff randomly and at least every 15 minutes on an irregular schedule. Documentation will include the patient's current observation level and meaningful action oriented statements that reflect the patient's actions while under observation, i.e. standing, sitting, resting, and eating.

        ii.    <u>Close Observation (SPII)</u> – Patient is checked and observed every 15 minutes or less. This watch requires that the patient remain in full view of a correctional staff member or medical staff when the check is done. This observation will be documented on the appropriate form by either trained security, medical or other staff randomly and at least every 15 minutes, on an irregular schedule. Documentation will include the patient's current observation level and meaningful action oriented statements that reflect the patient's actions while under observation, i.e. standing, sitting, resting, eating.

        iii.    <u>Mental Health Observation (MHO)</u> – Requires 30-minute interval observations. This watch requires that the patient be in full view of a

correctional officer when the check is done.

b.     Mental health staff will conduct daily evaluation of patients on suicide watch, and MHO and document in the health record.

c.     Patients on suicide watch and MHO will be monitored at least daily by health care staff to ensure that medical needs are met.

7.     Communication:

Daily communication is to be maintained between designated health staff, correctional staff, classification staff and others regarding any patient who is on suicide precautions.

8.     Intervention:

a.     When a suicide attempt is reported or identified, it will be treated as a medical emergency and medical staff shall respond immediately with appropriate emergency equipment.

b.     Every effort will be made to stabilize or resuscitate a patient who has attempted suicide while emergency medical support is summoned for immediate transport if necessary.

c.     Therapeutic measures conducted to stabilize adverse behavior shall begin with verbal reassurance or interaction; appropriate levels of medical restraints or therapeutic seclusion will be used as necessary.

9.     Notification:

Any completed suicide attempt shall be reported immediately to the Health Service Administrator and the shift supervisor for corrections and health services. The HSA will ensure that the facility administrator and the Medical Director or designee is informed. The facility administrator/designee shall notify outside authorities and family members of suicides.

10.     Reporting:

Health staff will participate in completing all reporting activities surrounding any suicide attempt or completion as required by the facility.

11.     Review:

Appropriate health care staff will participate in a medical and administrative review of suicides or attempted suicide within 30 days following the event. This will include a Psychological Autopsy completed by the Psychiatrist. Mortality review is a part of the CQI process.

12.     Critical Incident Debriefing:

a.     Mental health personnel will provide support for any staff member who has been affected by a suicide.

b.    The Director of Mental Health Services along with the HSA or designee shall confer with facility administration as well as all health services staff to assess support services required, and will plan accordingly to provide or make appropriate referral for services.

c.    Patients witnessing or impacted by a suicide in the facility shall be offered.

| Medical Director: | | Date: | 9-12-17 |
|---|---|---|---|
| H.S.A: | | Date: | 9-12-17 |