# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DEBORAH LOGAN, special )
administrator of the Estate of DARIUS )
HATFIELD, deceased, )
    )
        Plaintiff, )
    )
v. )    Case No.  20-cv-303-GKF-SH
    )
VIC REGALADO, in his official capacity )
as SHERIFF OF TULSA COUNTY, and )
Individually, et al. )
    )
        Defendants. )

---

## MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF OF DEFENDANT VIC REGALADO, IN HIS OFFICIAL CAPACITY AS SHERIFF OF TULSA COUNTY

---

HALL ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON, P.C.
Keith A. Wilkes, OBA 16750
320 South Boston Avenue, Suite 200
Tulsa, Oklahoma 74103-3708
T: 918.584.0400
F: 918.594.0505
kwilkes@hallestill.com

Filed: April 1, 2022

**TABLE OF CONTENTS**

I.      INTRODUCTION AND RELEVANT PROCEDURAL HISTORY........................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................................3

      Thursday Night, May 31, 2018 .................................................................3

      Friday, June 1, 2018 ..................................................................................3

      Saturday, June 2, 2018 ..............................................................................6

      Sunday, June 3, 2018 ................................................................................7

      June 5, 2018 ..............................................................................................9

      General .......................................................................................................9

ARGUMENT AND AUTHORITIES...........................................................................10

I.      STANDARD OF REVIEW. ............................................................................10

II.     MR. HATFIELD WAS PROVIDED ADEQUATE AND TIMELY
       MEDICAL EVALUATIONS, ADEQUATE MONITORING AND
       SUPERVISION AT THE JAIL. ......................................................................11

**TABLE OF AUTHORITIES**

*Atl. Richfield Co. v. Farm Credit Bank of Wichita*,
   226 F.3d 1138, 1148 (10th Cir. 2000) .............................................................10

*Bd. of County Comm'rs of Bryan County, Okla. v. Brown*,
   520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)...............................11

*Bird v. W. Valley City*,
   832 F.3d 1188, 1199 (10th Cir. 2016) .............................................................10

*Bryson v. City of Oklahoma City*,
   627 F.3d 784 (10th Cir. 2010) ....................................................................11, 12

*Crowson v. Wash. Cty. State of Utah*,
   983 F.3d 1166 (10th Cir. 2020) .......................................................................13

*Hinton v. City of Elwood*,
   997 F.2d 774 (10th Cir. 1993) .........................................................................12

*Jones v. Kodak Med. Assistance Plan,*
   169 F.3d 1287, 1291 (10th Cir. 1999) ................................................................10

*Kentucky v. Graham,*
   473 U.S. 159, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)....................................10

*Monell v. Department of Social Services,*
   436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) .........................11, 12, 13

*Myers v. Oklahoma County Bd. of County Comm'rs,*
   151 F.3d 1313 (10th Cir. 1998) ..........................................................................11

*Oklahoma City v. Tuttle,*
   471 U.S. 808 (1985).............................................................................................13

*Olsen v. Layton Hills Mall,*
   312 F.3d 1304 (10th Cir. 2002) ..........................................................................12

*Pembaur v. City of Cincinnati,*
   475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)....................................12

*Porro v. Barnes,*
   624 F.3d 1322 (10th Cir. 2010) ..........................................................................11

*Simmons v. Uintah Health Care Special Serv. Dist.*
   506 F.3d 1281 (10th Cir. 2007) .....................................................................12, 13

## FEDERAL RULES

Fed. R. Civ. P. 56.......................................................................................................1

FED. R. CIV. P. 56(a)...................................................................................................9

42 U.S.C. § 1983 ..................................................................................................2, 10

## LOCAL RULES

LCvR 56.1....................................................................................................................1

LCvR 56.1(b) ..............................................................................................................3

**DEFENDANT VIC REGALADO'S
MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF**

Pursuant to Fed. R. Civ. P. 56 and LCvR 56.1, Defendant Vic Regalado, in his official capacity as Sheriff of Tulsa County ("Sheriff Regalado"), hereby moves the Court for judgment as a matter of law against Plaintiff Deborah Logan, as Special Administrator of the Estate of Darius Hatfield, deceased.

## I.   INTRODUCTION AND RELEVANT PROCEDURAL HISTORY.

On Thursday, May 31, 2018, Darius Hatfield, shot and killed his girlfriend. Mr. Hatfield was arrested at the scene and, later that night, booked into the David L. Moss Criminal Justice Center ("Jail") on suspicion of First Degree Murder. During the Jail intake process, Mr. Hatfield stated that he was not suicidal. Because of his status as a first degree murder detainee, however, Mr. Hatfield was automatically placed in the Jail suicide watch protocol, and housed in the male suicide watch pod in the Segregated Housing Unit ("SHU").

The SHU intake process, conducted in the early hours of June 1, 2018, included another question and answer session with Mr. Hatfield, in which—consistent with his Jail intake two hours earlier—he again denied any suicidal ideation. Later that morning, the medical and mental health intake process for Mr. Hatfield included an initial in-depth review and interview over any mental health history or current issues he might have (in which Mr. Hatfield denied any relevant history or current symptoms). Mr. Hatfield was also seen and evaluated by the Jail psychiatrist, to whom Mr. Hatfield did not disclose or display any mental health issues. Accordingly, Mr. Hatfield was released from suicide watch, but because of his status as a First Degree Murder detainee, remained in and under the protection of the SHU. During his approximately 7 hours in a "suicide watch" cell, 30 eyes-on security checks were performed on Mr. Hatfield. During the 37 hour period after being removed from suicide watch, Mr. Hatfield 1) received multiple visits by members of the

medical and mental health teams, during which Mr. Hatfield did not communicate any mental health issues or concerns; and 2) was subjected to <u>65</u> safety and welfare checks by Jail detention officers in his SHU cell.

Despite consistently denying any suicidal ideations, mental health history, or current mental health issues; being evaluated by a psychiatrist and a licensed professional counselor; and having <u>95</u> eyes on security checks performed on him in his 57 hours at the Jail, 30 minutes after Mr. Hatfield's previous security check, in which he appeared "friendly and talkative" to a medical team member (who was accompanied by a detention officer), Mr. Hatfield was found hanging and non-responsive in his SHU cell. He passed away two days later at a Tulsa hospital.

Plaintiff sued Sheriff Regalado in his individual capacity for supervisor liability, and in his official capacity as Sheriff of Tulsa County, both pursuant to 42 U.S.C. § 1983. Complaint [Doc. 2-1, p. 5, ¶ 13].[1] On March 3, 2021, the Court entered an Opinion and Order dismissing Plaintiff's individual capacity supervisory liability claim against Sheriff Regalado, as well as portions of Plaintiff's "municipal liability" claims against the sheriff in his official capacity. Opinion and Order, March 3, 2021 [Doc. 45]. The dismissed "municipal liability" claims against Sheriff Regalado are: (1) that a severe limitation on the use of off-site medical service providers, even in emergent situations, caused Mr. Hatfield's alleged constitutional violations; (2) that a policy or practice of understaffing and underfunding caused Mr. Hatfield's constitutional injury; and (3) that under-training employees and/or officers on how to identify, assess, or react to emergent medical

---

[1] For consistency with federal civil procedure nomenclature, Plaintiff's state court petition is referred to here as a complaint. In his Complaint, Plaintiff also sued the Board of County Commissioners for Tulsa County and the Jail's administrator. Both defendants were dismissed by the Court for Plaintiff's failure to state claims against them upon which relief can be granted. Opinion and Order, March 2, 2021 [Doc. 44], and Opinion and Order, March 3, 2021 [Doc. 45].

situations caused the alleged constitutional violation. Opinion and Order, September 18, 2020 [Doc. 25, p. 8], and Opinion and Order, March 3, 2021 [Doc. 45, p. 9].

The Court did find, however, that Plaintiff met the minimum pleading requirements to plausibly allege that Jail employees and medical providers failed to evaluate, monitor, and treat Mr. Hatfield despite his alleged suicidal ideations, and that their acts constituted deliberate indifference to Mr. Hatfield's medical needs in violation of the Fourteenth Amendment. Opinion and Order, March 3, 2021 [Doc. 45]. While Plaintiff was able to state this claim at the outset of litigation to avoid early dismissal, she is now unable to prove the essential elements necessary to survive summary adjudication.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to LCvR 56.1(b), and for the purposes of this motion only, Sheriff Regalado submits the following concise statement of undisputed material facts which establish that no genuine issue of material facts exists to support Plaintiff's remaining claim, and that Sheriff Regalado is entitled to judgment as matter of law.

### Thursday Night, May 31, 2018

1.      Darius Hatfield was booked into the Jail in the late evening of May 31, 2018, on a complaint of First Degree Murder. *See* Arrest and Booking Report, attached as Exhibit 1.

2.      As part of his intake screening process at the Jail, Mr. Hatfield was asked but denied feeling suicidal or having thoughts of harming himself in the previous 24 hours. *See* Intake Screening Form, attached as Exhibit 2.

### Friday, June 1, 2018

3.      Two hours later, at 12:44 a.m. on June 1, 2018, and also as part of the intake process, a Classification Evaluation Questionnaire was reviewed and completed with Mr.

Hatfield's assistance. During this screening process, Mr. Hatfield denied ever having been clinically diagnosed with any type of mental health issue, and, consistent with his answer two hours earlier, again denied feeling suicidal. *See* Classification Evaluation Questionnaire, attached as Exhibit 3.

4.       Despite twice denying any suicidal ideation, because Mr. Hatfield was being detained under a complaint of First Degree Murder, as part of the Jail's protocol, Mr. Hatfield was automatically placed on "suicide watch" and taken to the SHU, where he was placed in the male suicide watch pod. *See* Deposition of Dr. Lewis, p. 9, ll. 18-22, pp. 30-31, ll. 14-25 and 1-2, attached as Exhibit 4; Full Patient History, p. 8 (Dalton Entries), attached as Exhibit 5; and Psychological Autopsy, p. 1 (within ¶ 2 of "Antecedent Circumstances"), attached as Exhibit 6.

5.       Jawaun Lewis, D.O., is a licensed psychiatrist who serves as the Jail psychiatrist and is the Psychiatric Director for Defendant Turn Key Health Clinics, LLC ("Turn Key"). Ex. 4, Lewis Depo., p. 4, ll. 19-20, p. 7, ll. 18-19.

6.       A detainee on suicide watch at the Jail is considered a mental health patient and is therefore under constant close watch by the mental health team ("Mental Health") and detention officers. *Id*. at p. 34, ll. 18-25, and p. 36, ll. 4-8.

7.       Jessica Mobley is a licensed practical nurse. Because of her education, training, and Turn Key's screening intake process, Nurse Mobley is qualified to determine whether a detainee has mental health symptoms, and to determine whether a detainee needs a referral to Mental Health. *Id*. at pp. 33-34, ll. 14-25 and 1-7.

8.       Nurse Mobley conducted an extensive medical and mental health screening intake with Mr. Hatfield later in the morning on June 1, 2018. *See* Ex. 5, Full Patient History, pp. 1-7.

9.      With respect to the mental health portion of the screening, Nurse Mobley recorded that she found Mr. Hatfield's behavior to be appropriate; he answered questions coherently; denied being on any medications for depression, psychosis, or any other mental health condition; was not currently thinking of suicide or hurting himself; did not report feelings of extreme hopelessness; reported that, prior to his arrest, he did not feel extremely depressed or experiencing little interest or pleasure in things that usually bring him joy; was not currently hearing voices or noises that others cannot hear; did not present with any signs or conditions of recent suicide attempts or self-harm; reported that he had never to a mental health professional for emotional or mental health problems; reported no history of mental health or depression related hospitalization in the past seven years; did not appear to be sad, irritable, emotionally flat, hallucinating, or showing signs of other mental health illness; and displayed no mental health symptoms. *Id.* at pp. 3-5. Accordingly, it was Nurse Mobley's opinion that Mr. Hatfield could be released from "suicide watch" status. *Id.* at p. 6.

10.      As part of the Jail and Turn Key's suicide watch protocol, Dr. Lewis saw Mr. Hatfield during his Mental Health patient rounds on the morning of June 1, 2018, in the male suicide watch pod. Ex. 4, Lewis Depo., pp. 14-15, and pp. 30-31, ll. 14-25 and 1-2.

11.      During Dr. Lewis's psychiatric examination, Mr. Hatfield reported no suicidal ideations, denied any prior psychiatric history, and denied any current mental health problems. Dr. Lewis also found that Mr. Hatfield did not display a major depressive disorder or a generalized anxiety disorder. As such, Dr. Lewis released Mr. Hatfield after Hatfield's mandatory time on suicide watch. Ex. 4, Lewis Depo., p. 31, ll. 3-25; Ex. 5, Full Patient History, p. 8; Ex. 6, Psychological Autopsy, p. 1 (within ¶ 2 of "Antecedent Circumstances").

12.     Dr. Lewis testified that under the "Current Symptom Severity" section of the Full Patient History, he noted Mr. Hatfield's level as "Mild" because there is no option in the electronic medical record program to select "No symptoms." Dr. Lewis explains that if a patient has no symptoms, the lowest severity level in the program to choose from is "Mild." Ex. 4, Lewis Depo., p. 32, ll. 5-15; and Ex. 5, Full Patient History, p. 9.

13.     Based upon his education and experience as a psychiatrist, Dr. Lewis testified that people who are suicidal will usually admit it when asked. Ex. 4, Lewis Depo., p. 23, ll. 15-17.

14.     On June 1, 2018, from the time Mr. Hatfield was placed in his cell in the male suicide watch pod shortly after midnight, until he was cleared from suicide watch at 8:48 a.m., a mental health restrictive housing security check was performed on him 30 times. *See* Mental Health Restrictive Housing Security Check, attached as Exhibit 7. Although he was removed from "suicide watch" status, because of the First Degree Murder complaint, Mr. Hatfield remained in the SHU as a segregated detainee.

15.     In addition to being seen by a nurse and the Jail psychiatrist on June 1, 2018, and after he was removed from "suicide watch" and the male suicide watch pod that afternoon, Jail detention officers physically checked on Mr. Hatfield in his SHU cell 13 times between 4:19 p.m. and 11:45 p.m. *See* Security Check Form, attached as Exhibit 8.

**Saturday, June 2, 2018**

16.     In the morning of June 2, 2018, a nurse checked on Mr. Hatfield in his SHU cell. When asked, Mr. Hatfield did not desire medical or mental health services. Ex. 5, Full Patient History, p. 22.

17.     During the late afternoon of June 2, 2018, a Mental Health Licensed Professional Counselor, John Fox, made a routine visit to Mr. Hatfield at the Jail. Counselor Fox reported that

Mr. Hatfield made no request for additional mental health services; that no referral for additional mental health services was needed at the time; that Mr. Hatfield reported he was adapting to his current incarcerated environment; that Mr. Hatfield reported no suicidal ideation or intent; and Mr. Hatfield reported that—if needed—he knew how to request Mental Health services at the Jail. *Id.* at p. 22. *See also* Deposition of John Fox, LPC, pp. 11-13, attached as Exhibit 9.

18.     Fox testified that based upon his experience as a Licensed Professional Counselor, if a person is feeling suicidal, when asked, they will disclose this fact to a medical health professional. Ex. 9, Fox Depo., p 17, ll. 1-4.

19.     At approximately 8:30 p.m., Mr. Hatfield was given a recreation break. During this break, Mr. Hatfield visited with a fellow SHU detainee. The detainee later reported that during their visit, Mr. Hatfield "was very upbeat and talkative," and that the two shared several laughs during their conversation. Witness Statement of Maurice Harding, attached as Exhibit 10.

20.     In addition to Mr. Hatfield's multiple encounters with medical and mental health professionals on Saturday, June 2, 2018, Jail detention officers physically checked on Mr. Hatfield's safety and welfare in his SHU cell on 37 separate occasions, all without incident. Ex. 8, Security Check Form.

**Sunday, June 3, 2018**

21.     Between midnight and approximately 7:00 a.m., on June 3, 2018, Jail detention officers physically checked on Mr. Hatfield's safety and welfare 13 times in the SHU, all without incident. *Id.*

22.     The security check on Mr. Hatfield conducted at approximately 7 a.m. was performed by Detention Officer Marko Bigit. Officer Bigit is identified in Exhibit 8, the Security Check Form, by his "SOMS#" 3970. The record specifically reflects that Officer Bigit conducted

7

the checks on Mr. Hatfield on June 3, 2018, at 0235, 0310, 0335, 0705, and 0738 hours.[2] *Id. See also* Affidavit of Maureen McAnally, attached as Exhibit 14

23. During the 0705 security check, a Turn Key Certified Medical Aide, Maureen McAnally, accompanied Officer Bigit. Ex. 5, Full Patient History, p. 39. During this check, Ms. McAnally gave Mr. Hatfield prescribed medication, checked his blood pressure, answered a few questions he had about medication, and found Mr. Hatfield to be both "pleasant and talkative." *Id.*; and Ex. 14, McAnally Affidavit.

24. The next check on Mr. Hatfield was also performed by Officer Bigit, and occurred approximately 30 minutes later, at 7:38 a.m. Ex. 8, Security Check Form. When Officer Bigit looked into Mr. Hatfield's cell, he found Mr. Hatfield unresponsive, with a sheet wrapped around his neck that was affixed to an overhead fire sprinkler. *See* Bigit Witness Statement, attached as Exhibit 11.

25. Officer Bigit called a medical emergency and requested a cut-down tool. Another detention officer unlocked the cell door from the SHU control booth to allow Officer Bigit to enter the cell. Officer Bigit jumped on a table to pull the sheet knot apart at the sprinkler head. *Id*.

26. As Officer Bigit loosened the upper knot, Detention Officer Kelly arrived and assisted Officer Bigit with placing Mr. Hatfield on the ground. *See* Kelly Witness Statement, attached as Exhibit 12.

27. Once Mr. Hatfield was laying on the ground, Officer Kelly checked for a carotid artery pulse and, after not detecting one, began CPR. *Id*. A third detention officer arrived with the cut-down tool, finding Mr. Hatfield now on his back next to the toilet. This officer began cutting

---

[2] The other security checks performed on Mr. Hatfield that morning were performed by another detention office at 0032, 0102, 0132, 0204, 0448, 0522, 0604, and 0631 hours. Ex. 8, Security Check Form.

the knot in the sheet from around Mr. Hatfield's neck. *See* Oglesby-Masters Witness Statement, attached as Exhibit 13.

28.   Once the knot was cut half-way through, Officer Kelly continued administering CPR until a nurse arrived and took over life-saving efforts. *Id*. After a second nurse arrived, the two nurses conducted CPR efforts—in tandem—by rotating between forcing of air into Mr. Hatfield's lungs using an Ambu-Bag, and providing chest compressions. *Id*.

29.   EMSA personnel arrived and worked on Mr. Hatfield on the premises before they transported him to a hospital at approximately 8:15 a.m. *See* Exhibits 11-13, Witness Statements.

## June 5, 2018

30.   Mr. Hatfield died in a Tulsa hospital two days later, on June 5, 2018. Complaint [Doc. 2-1].

## General

31.   During the time of Darius Hatfield's incarceration, Turn Key adopted policies within the Jail relating to: inmate access to care; the provision of mental health services; receiving screening for inmates; mental health screening and evaluation for all inmates; mental health evaluations for inmates in segregation; and the institution of a suicide prevention program. *See* Ex. 5 to Turn Key's Motion for Summary Judgment [Doc. 90], Affidavit of Dr. William Cooper, Turn Key Corporate Representative, with Selected Turn Key Policies within the Jail.

31.   On November 5, 2017, Turn Key's policies, practices, and provision of medical care were subject to an audit by the National Commission on Correctional Health Care ("NCCHC"). All policies referenced in UMF ¶ 31 were found to be in full compliance with NCCHC standards. *See* Ex. 6 to Turn Key's Motion for Summary Judgment [Doc. 90], 2017 NCCHC Audit Results, pp. 3, 10, 11, and 14.

32.     Kathryn J. Wild, RN, MPA, CCHP-RN, an expert witness who has opined that the care provided by Turn Key to Darius Hatfield, including Turn Key's intake screening, mental health services, and monitoring, were in full conformance with NCCHC standards and met reasonable and acceptable practices. *See* Ex. 7 to Turn Key's Motion for Summary Judgment [Doc. 90], Affidavit of Kathryn J. Wild with Expert Witness Report of Kathryn J. Wild.

33.     Dr. Bruce J. Cohen, M.D., an expert witness, has opined that the psychiatric care of Mr. Hatfield was appropriate and that his review of Mr. Hatfield's medical records revealed no evidence of medical negligence or deliberate indifference to Mr. Hatfield' psychiatric needs. *See* Ex. 7 to Turn Key's Motion for Summary Judgment [Doc. 90], Affidavit of Dr. Bruce J. Cohen, M.D. with Forensic Psychiatric Report of Dr. Bruce J. Cohen.[1]

## ARGUMENT AND AUTHORITIES

### I.    STANDARD OF REVIEW.

Pursuant to the Federal Rule of Civil Procedure and Tenth Circuit case law interpreting the same, "[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); FED. R. CIV. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

## II.   Mr. Hatfield was Provided Adequate and Timely Medical Evaluations, Adequate Monitoring and Supervision at The Jail.

The Undisputed Material Facts defy Plaintiff's surviving claims and allegations against Sheriff Regalado and Turn Key. Plaintiff asserts a cause of action against Sheriff Regalado in his official capacity only, for "municipal liability" under 42 U.SC. § 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). *See also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (holding that a claim against a government actor in his official capacity "is essentially another way of pleading an action against the county or municipality" he represents, and is considered under the standards applicable to § 1983 claims against municipalities or counties). There is no *respondeat superior* or vicarious liability under § 1983. *Monell*, 436 U.S. at 694.

A local government may be held liable where its action "*itself* violates federal law, or directs an employee to do so." *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404-05, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). But, "where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 406. To establish liability, the government official must have committed a constitutional violation, and the entity itself must have been the "moving force" behind the alleged deprivation, so the entity's "policy or custom" must have contributed toward the constitutional violation. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); *Monell*, 436 U.S. at 694-95; *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

To establish municipal liability under § 1983, "a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom

and the injury alleged." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)

(quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). Thus, when a state actor

deprives a person of a constitutional right, municipal liability may only be found when "the action

that is alleged to be unconstitutional implements or executes a policy, statement, ordinance,

regulation or decision officially adopted and promulgated by that body's officers." *Olsen v. Layton*

*Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002) (quoting *Monell*, 436 U.S. at 690). *See also*

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)

(holding that "[t]he 'official policy' requirement was intended to distinguish acts of the *municipality*

from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited

to action for which the municipality is actually responsible.") (emphasis in original).

The Tenth Circuit has identified several types of actions which may constitute a municipal

policy or custom:

> A municipal policy or custom may take the form of (1) a formal regulation
> or policy statement; (2) an informal custom amoun[ting] to a widespread
> practice that, although not authorized by written law or express municipal
> policy, is so permanent and well settled as to constitute a custom or usage
> with the force of law; (3) the decisions of employees with final policymaking
> authority; (4) the ratification by such final policymakers of the decisions—
> and the basis for them—of subordinates to whom authority was delegated
> subject to these policymakers' review and approval; or (5) the failure to
> adequately train or supervise employees, so long as that failure results from
> 'deliberate indifference' to the injuries that may be caused.

*Bryson*, 627 F.3d at 788 (citations and quotation marks omitted).

The Tenth Circuit recognizes that when "employees take actions specifically authorized by

policy or custom, their actions can be fairly said to be the municipality's. But when they act

inconsistently with official policy or custom, though perhaps even still within the scope of

employment, that will not suffice." *Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281,

1284 (10th Cir. 2007). Indeed, identifying a harm and alleging it was the result of a policy or custom

is not enough. "[S]ome limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter. Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm. . . ." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Further, there is a distinction between a municipal liability claim based on the alleged constitutional violations of individual officers, and claims that are based on the "sum of actions" of a municipality's officers. *Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020). "[W]here the actions of a municipality's officers do not rise to the level of a constitutional violation and the claim against the municipality is based on it serving as the driving force behind those actions, liability cannot lie." *Id*.

Here, the surviving portion of Plaintiff's "municipal liability" claim is based upon the allegations that both Sheriff Regalado—in his official capacity—and Turn Key, as a matter of policy, practice or custom:

1. Failed "to promulgate, implement, or enforce, adequate medical treatment, or supervision policies responsive to the serious medical needs of inmates like Mr. Hatfield." [Doc. 2-1, p. 11, ¶ 42(a)];

2. Failed "to do routine checks on inmates exhibiting suicidal behaviors and statements," and persistently ignored "suicidal statements and acts of inmates." [*Id*. at p. 12, ¶ 42(g) and (h)];

3. Failed "to isolate, and put on suicide watch, inmates who have exhibited suicidal statements or acts of self-harm." [*Id*. at p. 14, ¶ 53(j)].

4.      Maintained an inadequate medical triage screening policy or practice "that fails to identify inmates with serious medical needs," a practice of "[u]ntimely medical examinations and treatment at David L. Moss." [Doc. 2-1, p. 11, ¶ 42(b) and (d)];

5.      Failed to "to supervise, oversee, or otherwise require the mental health evaluations or suicide watch once an emergent suicide risk was determined." [*Id*. at p. 12, ¶ 42(f)]; and,

6.      Failed to provide "an adequate or timely medical evaluation, any assessment, or adequate medical monitoring and supervision or to otherwise care for Mr. Hatfield," [*id*. at p.11, ¶ 39] resulting in Mr. Hatfield being left alone with "instrumentalities of self-harm," as opposed to being "placed on suicide watch, placed in medical isolation, and placed in an environment where he did not have access to instrumentalities of self-harm." [*Id*. at p. 3, ¶ 9].

Not only is Plaintiff unable to support any of the above allegations with evidence, the established record provides indisputable evidence which displace the tales spun in Plaintiff's Complaint.

Mr. Hatfield was booked into the Jail in the late evening of May 31, 2018, on suspicion of a complaint of First Degree Murder. *See* Undisputed Material Fact ("UMF") ¶ 1 and Ex 1. As part of his initial Jail intake screening, Mr. Hatfield was asked—and he denied—feeling suicidal or thinking of harming himself in the previous 24 hours. *See* UMF ¶ 2 and Ex. 2. In the early minutes of June 1, 2018, and only two hours after his first suicide screening, Mr. Hatfield went through a second intake screening process in which he was again asked—and he again denied—currently feeling suicidal or having a history of being clinically diagnosed with any type of mental health issue. *See* UMF ¶ 3 and Ex. 3.

Despite twice denying any suicidal ideations or mental health issues, pursuant to the Jail's established protocol designed to protect him, Mr. Hatfield was automatically placed on "suicide watch" at the Jail based upon his status as a new First Degree Murder detainee. UMF ¶ 4.

After being placed on suicide watch, Mr. Hatfield was assigned to the SHU and placed in a male suicide watch pod. UMF ¶ 4. The evaluation and assessment of Mr. Hatfield's mental health status, however, did not end there. In the morning of June 1, 2018, a Turn Key nurse conducted an in-depth medical and mental health intake screening interview with Mr. Hatfield. UMF ¶ 8. Based upon her education, training, and Turn Key's screening intake process, the nurse who conducted this intake screening process is qualified to determine whether a detainee has mental health symptoms, and is also qualified to determine whether a detainee needs to be referred to Mental Health. UMF ¶ 9; Ex. 4, Lewis Depo., pp. 33-34, ll. 14-25 and 1-7.

In Mr. Hatfield's extensive medical and mental health intake screening, the administering nurse recorded that Mr. Hatfield's behavior was appropriate; he answered questions coherently; denied being on any medications or depression, psychosis, or any other mental health condition; was not currently thinking of suicide or hurting himself; did not report feelings of extreme hopelessness; reported that he did not, prior to his arrest, feel extremely depressed or found little interest or pleasure in things that usually bring him joy; was not currently hearing voices or noises that others cannot hear; did not present with any signs or conditions of recent suicide attempts or self-harm; reported that he had never been seen by a mental health professional for emotional or mental health problems; reported no history of mental health or depression related hospitalization in the past seven years; did not appear to be sad, irritable, emotionally flat, hallucinating, or showing signs of other mental health illness; and displayed no mental health symptoms. *See* UMF ¶ 9 and Ex. 5, Full Patient History, pp. 3-5.

15

Furthermore, because he was under the Jail and Turn Key's suicide watch protocol, Mr. Hatfield was included in the Mental Health patient rounds conducted by the Jail psychiatrist, Dr. Jawaun Lewis, on the morning of June 1, 2018. UMF ¶ 10 and Ex. 4, Lewis Depo., pp. 14-15. Dr. Lewis is a licensed psychiatrist and—in addition to serving as the Jail psychiatrist—serves as the Psychiatric Director for Turn Key. UMF ¶ 5 and Ex. 4, Lewis Depo. at p. 4, ll. 19-20, p. 7, ll. 18-19. During his psychiatric examination of Mr. Hatfield, Dr. Lewis recorded—and later testified—that Mr. Hatfield reported no suicidal ideations, denied any prior psychiatric history, and denied any current mental health problems. Dr. Lewis further concluded that Mr. Hatfield did not display a major depressive disorder or a generalized anxiety disorder, and could be released from "suicide watch." UMF ¶ 11; Ex. 4, Lewis Depo. at p. 31, ll. 3-25; Ex. 5, Full Patient History, p. 8; Ex. 6, Psychological Autopsy, p. 1 (within ¶ 2 of "Antecedent Circumstances"). During the seven (7) hours Mr. Hatfield was in his "suicide watch" cell on the morning of June 1, 2018, 30 security checks were performed on Mr. Hatfield to monitor his safety and well-being. Ex. 7, Mental Health Restrictive Housing Security Check Form.

In addition to Mr. Hatfield's encounters with medical and mental health professionals on June 1, 2018, after he was released from the male suicide watch pod and placed into a SHU cell, Jail detention officers physically checked on Mr. Hatfield safety and well-being 13 times between 4:19 p.m. and 11:45 p.m. *See* UMF 15 and Ex. 8, Security Check Form.

The next morning, June 2, 2018, a nurse checked on Mr. Hatfield in his SHU cell. When asked, Mr. Hatfield did not desire any medical or mental health services. Ex. 5, Full Patient History, p. 22. Later that afternoon, a Mental Health Licensed Professional Counselor made a routine visit to Mr. Hatfield in the SHU. UMF ¶ 17. The Mental Health counselor reported and testified that Mr. Hatfield was asked but made no request for additional mental health services;

that no referral for additional mental health services was needed at the time; that Mr. Hatfield reported he was adapting to his current environment, and reported no suicidal ideation or intent to harm himself, and that, if needed, Mr. Hatfield knew how to request Mental Health services at the Jail. *See* Ex. 5, Full Patient History, p. 22; UMF ¶ 17; and Ex. 9, Fox Depo. pp. 11-13.

In addition to Mr. Hatfield's multiple encounters with Turn Key staff, receiving his meals from Jail employees, and taking a supervised recreation break, on June 2, 2018, detention officers physically checked on Mr. Hatfield's safety and welfare in his SHU cell on <u>37</u> separate occasions, without incident. UMF ¶ 20; Ex. 8, Security Check Form.

In the seven hour period between midnight and approximately 7:00 a.m. on June 3, 2018, Jail detention officers physically checked on Mr. Hatfield's safety and welfare in his SHU cell 13 times, all without incident. UMF ¶ 21; Ex. 8, Security Check Form. During the 7 a.m. welfare check—the last check before Mr. Hatfield was found unconscious—a Turn Key team member accompanied the Jail detention officer to give Mr. Hatfield his prescribed medications. Ex. 5, Full Patient History, p. 39. The team member reported that during this visit, she gave Mr. Hatfield his prescribed medication, checked his blood pressure, answered two questions he had about medication, and found Mr. Hatfield to be both "pleasant and talkative." *Id.*[3] *See also* Ex. 14, McAnally Affidavit.

The next welfare check on Mr. Hatfield was performed at approximately 7:38 a.m. *See* Ex. 8, Security Check Form. When Detention Officer Bigit looked inside the cell, he saw Mr. Hatfield with a bed sheet wrapped around his neck, affixed to a fire sprinkler head. Ex. 11, Bigit Witness

---

[3]This account is consistent with the report by a fellow SHU detainee, who shared a recreation break with Mr. Hatfield at approximately 8:30 p.m. the night before. The detainee described Mr. Hatfield as "very upbeat and talkative," and that they enjoyed several laughs together. UMF ¶ 19 and Ex. 10, Harding Witness Statement.

Statement. Officer Bigit called a medical emergency and requested a cut-down tool. Another detention officer responded by unlocking the cell from the SHU control booth. *Id*. Once inside, Officer Bigit jumped on a table in the cell and began pulling the knot apart that held the sheet to the sprinkler head. *Id*. As Officer Bigit loosened the upper knot, Detention Officer Kelly arrived and assisted Officer Bigit in lowering and placing Mr. Hatfield on the ground. Ex. 12, Kelly Witness Statement. Once Mr. Hatfield was flat on the ground, Officer Kelly checked for a carotid artery pulse and, after not detecting a pulse, began CPR. *Id*. A third detention officer arrived with the requested cut-down tool. Ex. 13. Oglesby-Masters Witness Statement. This officer reported that by this time, Mr. Hatfield was flat on his back next to the toilet. The officer cut the sheet that was around Mr. Hatfield's neck to loosen the fabric, and Officer Kelly continued administering CPR until a nurse arrived and took over life-saving efforts. *Id*. After a second nurse arrived, the two nurses conducted CPR in tandem by rotating the forcing of air into Mr. Hatfield's lungs—via an Ambu-Bag—and providing chest compressions. *Id*. EMSA arrived next, worked on Mr. Hatfield at the scene, and then transported him to a local hospital where he passed away two days later. *See* UMF ¶¶ 29-30.

Despite this tragic end, in the 57-plus hours Mr. Hatfield was detained in the Jail, he was repeatedly asked whether he was feeling suicidal or wanted to hurt himself, which he denied; was provided with multiple and timely medical and mental health screenings; and was evaluated by both a Psychiatrist and a Licensed Professional Counselor. The record evidence also reveals that because of the crime for which he was being detained, First Degree Murder, as a matter of policy, Mr. Hatfield was automatically placed on suicide watch and was assigned to the male suicide watch pod in the SHU. During his seven-plus hours on suicide watch, <u>30</u> security checks were performed on Mr. Hatfield in his cell. The record evidence further reveals that after he was

removed from suicide watch status, Mr. Hatfield remained in the SHU—in a cell by himself—where detention officers performed <u>65</u> separate safety and welfare checks on Mr. Hatfield over the last 39 hours of his Jail detention, for **a total of 95 eyes-on security checks of Mr. Hatfield in his 57 hours** of Jail detention. And, of course, in the next to last security check, performed approximately 30 minutes before the last check, when he was found unresponsive in his cell, a Turn Key medical team member—who accompanied the detention officer—observed Mr. Hatfield to be both "pleasant and talkative."

All of record evidence directly and indisputably refutes or renders inapplicable Plaintiff's bald allegations that Sheriff Regalado and Turn Key failed "to promulgate, implement, or enforce, adequate medical treatment, or supervision policies responsive to the serious medical needs of inmates like Mr. Hatfield" [Doc. 2-1, p. 11, ¶ 42(a)]; failed "to do routine checks on inmates exhibiting suicidal behaviors and statements" and persistently ignored "suicidal statements and acts of inmates" [*Id.* at p. 12, ¶ 42(g) and (h)]; failed "to isolate, and put on suicide watch, inmates who have exhibited suicidal statements or acts of self-harm" [*id.* at p. 14, ¶ 53(j)]; maintained an inadequate screening policy or practice "that fails to identify inmates with serious medical needs" [Doc. 2-1, p. 11, ¶ 42(b)]; engaged in a practice of "[u]ntimely medical examinations and treatment at David L. Moss" [*id.* at ¶ 42(d)]; failed "to supervise, oversee, or otherwise require the mental health evaluations or suicide watch once an emergent suicide risk was determined" [*id.* at p. 12, ¶ 42(f)]; and failed to provide "an adequate or timely medical evaluation, any assessment, or adequate medical monitoring and supervision or to otherwise care for Mr. Hatfield" [*id.* at p.11, ¶ 39], resulting in Mr. Hatfield being left alone with "instrumentalities of self-harm," as opposed to being "placed on suicide watch, placed in medical isolation, and placed in an environment where he did not have access to instrumentalities of self-harm" [Doc. 2-1, p. 3, ¶ 9].

Plaintiff cannot meet her burden to survive summary adjudication. The record evidence fails to establish that there was any reason for the Jail or Turn Key to believe Mr. Hatfield was at a substantial risk of committing suicide, and there is no record of a constitutional deprivation to trigger municipal liability against Sheriff Regalado. As a matter of law, applying the undisputable material facts, judgment in favor of Sheriff Regalado and against Plaintiff is proper.

Dated: April 1, 2022                             Respectfully submitted,

                                                 HALL, ESTILL, HARDWICK, GABLE, GOLDEN
                                                  & NELSON, P.C.

                                                 *s/ Keith A. Wilkes*
                                                 Keith A. Wilkes, OBA #16750
                                                 320 South Boston Avenue, Suite 200
                                                 Tulsa, Oklahoma  74103-3708
                                                 T: 918.584.0400
                                                 F: 918.594.0505
                                                 kwilkes@hallestill.com
                                                 **ATTORNEYS FOR SHERIFF REGALADO**

CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2022, I caused the foregoing Motion for Summary Judgment to be electronically transmitted to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the ECF registrants in this matter.

*s/ Keith A. Wilkes*
Keith A. Wilkes

I further hereby certify that on April 1, 2022, I caused the foregoing Sealed Exhibits 5 and 6 referenced in the Motion for Summary Judgment will be transmitted via email to the ECF registrants in this matter:

*s/ Keith A. Wilkes*
Keith A. Wilkes