```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3
   DEBORAH LOGAN, as Special    )         DEFENDANT'S
 4 Administrator of the Estate  )          EXHIBIT
   of DARIUS HATFIELD,          )             4
 5                              )
              Plaintiff,        )
 6                              )
                                )    Case No. 20-CV-303-GKF-SH
       -vs-                     )
 7                              )
   VIC REGALADO, in his official)
 8 capacity as TULSA COUNTY     )
   SHERIFF, and TURN KEY        )
 9 CLINICS, LLC,                )
                                )
10            Defendants.       )

11                      ****************
              THE DEPOSITION OF JAWAUN LEWIS, D.O. taken on
12 behalf of the Plaintiff in the above styled and numbered
   cause, taken on the 14th day of January, 2022, in Tulsa,
13 Oklahoma before me, Dalene Lawrence, a Certified Shorthand
   Reporter duly certified under and by virtue of the laws of
14 the State of Oklahoma, pursuant to the stipulations
   hereinafter set forth.
15                      ****************

16              A-P-P-E-A-R-A-N-C-E-S

17 FOR THE PLAINTIFF:            MR. HOWARD BERKSON
                                 BOSTON AVENUE LAW
18                               401 S. Boston, Ste. 500
                                 Tulsa, OK 74103
19
   FOR THE DEFENDANT,            MS. JO LYNN JETER
20   TURN KEY HEALTH             NORMAN WOHLGEMUTH CHANDLER
     CLINICS, LLC:               JETER BARNETT & RAY
21                               401 South Boston
                                 Suite 3200
22                               Tulsa, OK 74103

23 FOR THE DEFENDANT,            MR. KEITH A. WILKES
     VIC REGALADO                HALL ESTILL HARDWICK
24   in his official             GABLE GOLDEN & NELSON
     capacity as Tulsa           320 South Boston
25   County Sheriff:             Tulsa, OK 74103
```

```
 1                    JAWAUN LEWIS, D.O.
 2   of lawful age, who having been first duly sworn to testify
 3   the truth, the whole truth and nothing but the truth,
 4   answered in reply to the questions propounded as follows:
 5
 6                    DIRECT EXAMINATION
 7   BY MR. BERKSON:
 8        Q    Dr. Lewis, my name is Howard Berkson.  I'm an
 9   attorney and I represent the Plaintiff in this case.  And so
10   the purpose of a deposition is to try and, this is part of an
11   investigation into what the claims and the defenses by all
12   the parties, really, to get to the truth of the matter.  Have
13   you ever been deposed before?
14        A    Yes.
15        Q    So even though you've been deposed before,
16   every lawyer has their own round of instructions they like to
17   give.  I've written mine down.  You're a college-educated
18   man; I'm sure you can read them.
19                    (Whereupon, Deposition Exhibit No. 1
20   was marked for identification).
21        Q    Here's a copy for you and your attorney.
22        A    Okay.
23        Q    Do you understand the rules in Exhibit 1?
24        A    I do.
25        Q    And if you have any questions about them, you
```

```
1   can always ask me.  If you're not comfortable with that, you
2   can talk to your own counsel for advice on that.
3          I'd like to start with your basic educational
4   history, professional background.  Let's go ahead and spell
5   your full name for the record, if you would, please.
6       A      J-A-W-A-U-N, L-E-W-I-S.
7       Q      Thank you.  And where did you go to high
8   school?
9       A      I went to high school in Okmulgee, Oklahoma.
10      Q      And from there, where did you go to college?
11      A      I went to Langston University.
12      Q      Where is that located?
13      A      That's located right outside Guthrie,
14  Oklahoma.  From there, I went to Oklahoma State University
15  Medical School.
16      Q      Very good.  Where did you do your residency?
17      A      At Griffin Memorial Hospital in Norman,
18  Oklahoma.
19      Q      And you're a psychiatrist?
20      A      Yes.
21      Q      Thank you.  We'll move from there to your work
22  history.  After you finished your residency, where was your
23  first job in the health care field?
24      A      Oh, let's see.  That was a long time ago.
25  First job would have been outpatient.  I took a position in
```

```
1       Q       So we've got a Lead Nurse Manager.  And then
2  who did you say would be technically right under that person?
3       A       So the Director of Nursing is under the House
4  Supervisor.
5       Q       Is the Lead Nurse Manager the same as the
6  House Supervisor?
7       A       Lead Nurse Manager would be the Director of
8  Nursing.  House Supervisor is her superior.
9       Q       Now, one person that I'll be talking to is
10 John Fox.  And John Fox as an LPC.
11      A       Correct.
12      Q       Was John Fox in your house or over with the
13 Lead Nurse Manager?
14      A       He's under Mental Health.
15      Q       So does that put him under your supervision?
16      A       Technically, he would be under Dr. Irvin, who
17 is the Psychological Director.
18      Q       What is your title at Turn Key?
19      A       I'm Psychiatric Director.
20      Q       So Dr. Irvin is your peer?
21      A       Yes.
22      Q       So one thing I'm curious about is kind of a
23 good question, and I don't know if I can narrow it down.  We
24 might have to work this out together.  But you have, in the
25 jail setting, you have custodial staff.  All right?  So you
```

```
 1   segregated and they don't want to do it, the jail staff, that
 2   just doesn't happen?
 3        A    Right.  That's not my call.  I can only clear
 4   a person off Mental Health; that's up to the jail to place
 5   him.
 6        Q    So if you think someone needs to be put on
 7   suicide watch, if they don't have the staff or if it's not a
 8   priority or any of a dozen other reasons why they might not
 9   do that or might delay that, is that all on the jail staff
10   then?
11        A    No.
12             MS. JETER:  Objection to form.
13             MR. WILKES:  And Doctor, wait just, just a
14   pregnant pause to give us a chance to perhaps object.  We
15   aren't going to object much, I'm sure.  But thank you.
16             THE WITNESS:  Okay.
17        Q    So when they object like that, if you
18   understand the question, you can answer it.  I don't want you
19   to speculate.  But if you don't understand the question, then
20   tell me to rephrase it or give me some information about what
21   you don't understand and I'll clean it up for you.
22        A    Okay.
23        Q    So what I'm asking about is, if you believe
24   that an inmate needs to be put on suicide watch, if for any
25   reason that doesn't happen after you've communicated it to
```

```
 1      Q      Right.  So the first line and in the first box
 2  under Tasks, there's a heading there that says Tasks.  Do you
 3  see that?
 4      A      Yes.
 5      Q      Says "Appointment Scheduled Date: 6/1/2018".
 6  Did I read that right?
 7      A      Right.
 8      Q      Two lines down, there's an Appointment
 9  Description.  What's the Appointment Description there?
10      A      Says Intake - Medical - date, time, and blood
11  pressure check.
12      Q      Do you see anywhere in that collection of
13  boxes for that task where the blood pressure is listed?
14             MS. JETER:  Object to form.
15      A      In this specific box on this page, no.
16      Q      If we go to page 30, the first complete box in
17  my view is the one in the middle of the page.
18      A      Correct.
19      Q      It's a little narrower than the ones above and
20  below it.  Can you identify that box?
21      A      Yes.
22      Q      So there's an appointment June 1, 2018.  Do
23  you see the date at the top?
24      A      Correct.
25      Q      Did I read that right?
```

```
1       A       Yes.
2       Q       Who set that appointment?
3       A       Set by myself.
4       Q       Do you have any idea what that appointment was
5  about?
6       A       It seems like it was a mental health round,
7  which it appears that he may have been on suicide watch and
8  when he was placed on suicide watch, that created a task to
9  be completed.
10      Q       So going back to page 2, when we're talking
11 about Ms. Mobley's work again, we were looking at Patient
12 Vitals before, six boxes from the bottom.  And I don't know
13 what the details are and they don't appear to be in the
14 tasks.  Would those vitals normally be reported in a task?
15              MS. JETER:  Object to form.
16      A       Typically it's not included in the task
17 itself.
18      Q       So two lines down, I've got a blood pressure
19 check.  Do you see that two boxes down from Patient Vitals?
20      A       "High blood pressure"?
21      Q       Yes.  It says "Note details".  Right?
22      A       Correct.
23      Q       What's it say in the next box over?
24      A       "Yes".
25      Q       Are there any details about high blood
```

```
 1   hurting yourself?"  Do you see that box?
 2        A      Yes.
 3        Q      It goes on and says "If yes, what is your
 4   plan?" and "If yes, place on suicide watch immediately".  Is
 5   that correct?
 6        A      Correct.
 7        Q      What was Mr. Hatfield's answer according to
 8   Ms. Mobley?
 9        A      "No".
10        Q      How often do people say "no" to that question
11   and then attempt suicide?
12               MS. JETER:  Object to form.
13        A      I can't give any specific data on how often.
14   It's not common.
15        Q      So usually if people have suicidal ideation,
16   they will admit it?
17        A      If they're truly suicidal, yes.
18        Q      Go ahead and turn to page 5.
19        A      (Witness complies).
20        Q      There's a partial box that's cut off at the
21   bottom.  I'm counting that as one, too.  So five boxes from
22   the bottom, it says "Does patient appear to be sad,
23   irritable, emotionally flat?"  Do you see that box?
24        A      Yes.
25        Q      And what did Ms. Mobley report?
```

```
 1      Q         And do you have any idea how long that session
 2   was?
 3      A         The session with me and --
 4      Q         And Mr. Hatfield.
 5                MS. JETER:  Object to form.
 6      A         I don't recall how long exactly.
 7      Q         How long would a session like that usually
 8   take?
 9                MS. JETER:  Object to form.
10      A         Typically maybe 10, 15 minutes.
11      Q         Now, in Box 5, the question is "Reason for
12   Mental Health Encounter".  Do you see that box?
13      A         Yes.
14      Q         What was the reason for that Mental Health
15   encounter?
16      A         Suicide precaution.
17      Q         Why are you visiting with this inmate in
18   particular for suicide precautions?
19      A         Because he most likely was on the male suicide
20   watch pod, and I did rounds on all of those patients every
21   day.
22      Q         Do you have any idea why he was on that pod?
23      A         Murder was -- I believe it was the Murder-1
24   charge.
25      Q         So it's an administrative requirement because
```

```
1    of the charge.  Is that correct?
2         A     Correct.
3         Q     On page 9 of Exhibit 3, the next page, two
4    boxes up from the bottom, it says "Provisional DSM-5
5    Diagnosis".  Do you see that box?
6         A     Yes.
7         Q     What's your response?
8         A     "No diagnosis".
9         Q     Is 10 to 15 minutes enough time typically to
10   diagnose anything?
11        A     Yes, because there's no prior health history
12   per the chart and patient denied any mental health problems.
13        Q     Is that the full standard for diagnosing a
14   person with suicidal ideation or depression?
15              MS. JETER:  Object to form.
16              MR. WILKES:  Same objection.
17        A     There's no diagnosis of suicidal ideation in
18   the DSM-5 diagnosis or disorders.  And at that time, he had
19   no major depressive disorder, no generalized anxiety
20   disorder.
21        Q     How would you be able to tell that in 10 or 15
22   minutes?
23        A     By speaking with him and looking at his chart,
24   going through his past history, and asking specific
25   questions.
```

```
 1        Q      And at the time that you were looking at his
 2   chart, would Turn Key be in possession of his prior medical
 3   records?
 4        A      Probably if he had just came in, no.
 5        Q      Then in the bottom box on page 9, it says
 6   "Current Symptom Severity".  Is that correct?
 7        A      Correct.
 8        Q      What was his symptom severity that you
 9   reported?
10        A      "Mild".
11        Q      So he had some symptoms, but they were mild.
12   Is that correct?
13        A      So if I can recall, the box is only "Mild".
14   There's no option to say "No symptoms".  So anybody that's
15   coming in is "Mild" if they have no symptoms.
16        Q      Or if they have mild symptoms?
17        A      Or if they have mild symptoms, yes.
18        Q      So it's ambiguous; would you agree?
19               MS. JETER:  Object to form.
20        A      Could be, yes.
21        Q      Do these appear to be mostly Miss Mobley's
22   intake questions going on.  Let's turn to page 17 of Exhibit
23   3, please.
24        A      (Witness complies).
25        Q      The first box that has words in Box 3.  Says
```

```
 1   "Disposition/Plan of Action".  Do you see that?
 2        A     Yes.
 3        Q     And it says "No mental health symptoms -
 4   general population".  Is that correct?
 5        A     Correct.
 6        Q     And that was entered by Ms. Mobley?
 7        A     Correct.
 8        Q     Do you know what Ms. Mobley's health care
 9   licensure is?
10        A     I do not.
11        Q     I'll represent to you that Turn Key told me
12   she's an LPN.  Does that sound right to you?
13        A     Sounds correct.
14        Q     Is Ms. Mobley qualified to determine that an
15   inmate has no mental health symptoms?
16        A     Yes.  Going by the screening intake, using the
17   screening intake, she can decide whether or not they need to
18   be referred to Mental Health.
19        Q     So using the screening device, she can
20   determine if he has mental health symptoms?
21        A     Yes.  They have training.  So I would expect
22   her to make a determination on whether or not he needs
23   further work-up for mental health.
24        Q     But my concern is she wrote "No mental health
25   symptoms".  It's that statement that I'm zeroing in on.  And
```

```
 1   I'm curious if she's qualified to say that an inmate has no
 2   mental health symptoms.
 3              MS. JETER:  Objection.  Asked and answered.
 4         A    Based on what she saw, yes, she can answer
 5   that question.
 6         Q    She can make that statement?
 7         A    Yes.
 8         Q    Page 20 of Exhibit 3.  Box 2 or 3, depending
 9   how you count, it says "Mental Health Patient".  Do you see
10   that box?
11         A    Yes.
12         Q    What did Ms. Mobley record there?
13         A    "Yes".
14         Q    What's the effect of that classification?
15         A    I believe that, because of his chart, he had
16   to be housed in Mental Health.  So she put, I'm assuming she
17   put "Mental Health Patient" because of that.
18         Q    So I understand him being put on suicide watch
19   because of his charge and as a matter of policy.  He's going
20   there, whether he's fine or mentally suffering.  But when you
21   label a patient "Mental Health Patient", what does that put
22   into action?  What happens when a person is labeled a mental
23   health patient?
24         A    Mental Health will check on him, follow up
25   with him or her.
```

```
 1      Q      And is that personally or by camera?
 2      A      By camera and, on our unit, it's personally
 3   through detention officers.
 4      Q      So other than being watched, are there any
 5   other conditions in housing or treatment for a person on
 6   suicide watch versus a person in the general population?
 7      A      Mental Health will see that patient every
 8   single day.
 9      Q      Is their cell effectively the same?
10      A      Their cell, they're usually in a cell to
11   themselves.
12      Q      So they're isolated?  Are the furnishings
13   within the cell the same or different?
14      A      I think the bed is different and they are not
15   allowed to have their clothes; they have a blanket.
16      Q      On page 20, six pages (sic) up from the
17   bottom, it asks about nausea and vomiting.  Do you see that?
18      A      Yes.
19      Q      What did Ms. Morrow report as Mr. Hatfield's
20   response to that?
21      A      "Nausea with no vomiting".
22      Q      Is that possibly a symptom of anxiety?
23      A      Could be.
24      Q      Let's go to page 22.
25      A      (Witness complies).
```